Filed 6/30/22  In re D.T. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re D.T., a Person Coming Under the Juvenile Court Law. | B313183 |
| _____ | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 18CCJP07474A |
| Plaintiff and Respondent, | |
| v. | |
| B.T., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Jean M. Nelson, Judge.  Affirmed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Tarkian & Associates and Arezoo Pichvai, for Plaintiff and Respondent.

_____

A mother appeals the juvenile court's order terminating her parental rights as to her daughter D.T. We affirm. Undesignated statutory references are to the Welfare and Institutions Code.

I

In September 2018, the mother and her boyfriend brought the boyfriend's 19-month-old daughter to the ER with first degree burns on her legs and buttocks. The daughter had been in the mother's care. The doctors who examined the child believed the injuries were inconsistent with the mother's story or with an accident. It looked as though the child had been dipped in hot water.

The mother, boyfriend, and Department agreed to a safety plan. After the mother and boyfriend failed to comply with the plan, the Department detained D.T., the mother's then three-year-old daughter, from the mother. The Department filed a petition alleging D.T. was at risk in the mother's care based on several injuries the boyfriend's daughter suffered while in the mother's care.

In November 2019, the juvenile court ordered D.T. detained from her mother. The mother had monitored visits with D.T. that went well. D.T. seemed comfortable with her mother, appeared sad or teary at the end of the visits, and told her mother she wanted to go with her.

In interviews, D.T. told the social worker her mother had put the boyfriend's daughter in hot water because she was not listening and took D.T.'s toys. D.T. made similar statements to a foster parent. D.T. said her mother would "smack" her with a shoe when she was bad.

2

In May 2019, the Department placed D.T. with foster mother T.A. after D.T.'s needs overwhelmed the original foster parent. In June 2019, the juvenile court sustained the petition, asserted jurisdiction, and continued D.T.'s placement with foster mother T.A. The mother's case plan required her to participate in parenting classes, anger management classes, and individual counseling. The court ordered monitored visits two to three times a week.

D.T. did well in her new foster home. Her tantrums and episodes of bedwetting decreased. She remained fearful of taking a bath and the water being too hot. At the foster mother's request, D.T. began individual therapy, and her behavior improved even more. Her tantrums decreased from 14 a week to one to two.

The foster mother monitored D.T.'s visits with the mother and reported the mother generally acted appropriately and lovingly. However, the mother did not know how to deal with D.T.'s tantrums and would sometimes make them worse. D.T.'s behavior during visits with her mother got worse the longer she had been separated from her mother. The foster mother reported the mother did not know how to discipline D.T. and would often make her cry. D.T. would make untrue statements to get a reaction or approval from her mother. The mother discovered D.T. had lice during a visit and became so upset she made D.T. cry, despite the foster mother's attempts to defuse the situation.

On three separate occasions, the mother hit D.T. during monitored visits. While they were at a store, D.T. hid on a shelf, and her mother "hit her on the butt, not hard." D.T. then put a blanket in her mouth, and her mother moved to hit it out of her mouth. D.T. moved, and the mother hit D.T. in the eye. A few

3

months later, while they were at a restaurant, the mother took D.T. alone to the restroom without permission from the foster mother. When the foster mother found them coming back, D.T. was crying. She later told the foster mother and a social worker that her mother had hit her cheek. At the end of another visit, the mother was putting D.T. in her car seat and D.T. hit her mother, who hit her back. When the foster mother said, "You hit her again," the mother replied, "Well she hit me."

In interviews with social workers, the mother denied hitting D.T. at the restaurant, claimed the incident at the store was an accident, and that in the third incident she had simply put her hand to her eye and had not touched D.T. After the restaurant incident, the Department took over monitoring visits.

The mother participated in and completed parenting classes. She engaged in individual therapy and began to accept some responsibility for what happened to the boyfriend's daughter, although she continued to say it was accidental. The mother told the social worker she had met her treatment goals and therefore no longer needed therapy. The therapist stated the mother appeared to be making progress but, according to the agency's policy, could not comment on reunification. The counseling agency later said they referred the mother to a new therapist, but the mother declined further services. The social worker encouraged the mother to continue therapy and she eventually did. Her new therapist reported the mother showed an understanding of appropriate parenting techniques and of alternative methods to manage frustration, though the therapist also could not comment on reunification. The mother took 10 months to finish a six-month anger management class. The

mother had trouble saying what she learned when asked by the social worker.

The mother and D.T. engaged in Parent-Child Interactive Therapy. The mother made gradual progress but, despite having 17 sessions, had not moved to stage two when the pandemic started. Generally families move to stage two after 10 sessions. During one session, D.T. began to talk about her mother hitting her, and her mother denied it. The therapist believed the mother minimized the seriousness of hitting D.T. D.T. was sometimes disrespectful toward her mother during sessions and showed negative attention-seeking behaviors.

D.T.'s therapist said D.T. loved her mother but had many mixed feelings. D.T. at one point told the therapist "mom[']s bad." D.T. also told a social worker she wanted to return to live with her mother, but only if the judge taught her mother not to hit D.T. D.T. also told the social worker she wanted to live with the foster mother and would tell the social worker when she felt ready to return to her mother. When the mother told D.T. she might be coming home soon, D.T. began regressing and having more tantrums.

D.T. continued to bond to the foster mother. D.T. built a strong relationship with the foster mother, felt safe with her, and began to share more about her past trauma. The foster mother said D.T. was very loving and sweet and a joy to have in her home. The foster mother met D.T.'s medical, dental, emotional, and educational needs and provided a loving, stable, and nurturing home. The foster mother's extended family loved and adored D.T. The foster mother said she was willing and able to adopt D.T. if the mother was not able to reunify.

The social worker reported she had concerns regarding the mother's lack of insight and understanding of how her actions affected D.T. The mother continued to deny wrongdoing in relation to the boyfriend's daughter's injuries.

In August 2020, at the section 366.22 review hearing, the juvenile court stated "it is clear that mother is not learning how to control herself with her child, despite all of the services she has done." The court recognized, "It is clear that there is a pattern of hitting and that [D.T.] fears her mother because she has been hit in the past and fears she will be hit again. I don't make the decision simply based on what [D.T.] thinks or fears, but her fears are confirmed by three incidents during monitored visits. . . ." The court terminated reunification services for the mother.

D.T.'s individual therapist reported that D.T. was making progress. The therapist believed services could be concluded soon, but she wanted to make sure there were no significant changes for D.T. first, "because that can bring up some concerns." When the social worker told the therapist the foster mother was willing to adopt D.T., the therapist said "that is a really good plan" and that she could see "the attachment that [D.T.] has with [the foster mother]."

The mother continued to have monitored visits with D.T. D.T. enjoyed the visits, but she told the social worker she wanted to visit her mother but live with the foster mother. D.T. gave different reasons why, including that she was scared her mother would hit her, she did not want to leave the dogs in the foster home, or she would live with her mother when she was older. The social worker believed D.T. felt safe and secure with the foster mother but continued to have fears about returning to her

6

mother.  D.T. did not have negative reactions and seemed fine at the end of visits.  After D.T. knew the plan was for the foster mother to adopt her, D.T. appeared to feel safe and no longer worried about returning to her mother.

The foster mother believed D.T. was having trouble in school.  She contacted the school, had D.T. evaluated for special education services, and had scheduled a meeting to discuss an individualized education plan.

The foster mother reported the mother seemed to have accepted D.T. would be adopted and said she hoped the foster mother would continue to let her visit D.T.  The foster mother said she would as long as the mother was appropriate.

In February 2021, Dr. Gerardo Canul prepared a court-ordered bonding study of the mother and D.T.  Canul found the two were comfortable with each other.  Canul concluded, "It is a moderate likelihood that on-going contact between the minor and the mother will provide a moderately consistent positive and nurturing reciprocal relationship."  He noted based on the mother's challenges with consistent housing, social and familial support, and financial support the "long-term parenting effectiveness of the mother will be poor."  He found the mother's awareness of D.T's psychological, developmental, and emotional needs was "low-average."  He characterized the quality of the relationship as "moderately strong."

In May 2021, the juvenile court held the section 366.26 hearing to select and implement a permanent plan.  The Department and counsel for D.T. requested the court terminate the mother's parental rights.  The mother's trial counsel argued the parental bond exception applied.  The juvenile court found the mother had maintained consistent visits and had a bond with

D.T.  However, the court stated for the exception to apply it had to find "something more than a loving bond where the parent comes forth and just visited twice a week and has really played a parental role in the child's life, that if terminated, would be so disruptive and that outweighs the benefit of adoption. . . . And I don't have that here. . . . [W]hile the mother's bond with the child is strong to a degree, it is not of the quality that justifies disrupting a plan of adoption."  The juvenile court found by clear and convincing evidence D.T. was likely to be adopted and terminated the mother's parental rights.

The mother appealed.

## II

The mother argues the juvenile court erred in finding the parental bond exception did not apply because the court relied on the mother's failure to reunify in violation of the principles articulated in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) and "minimized" the mother's bond with D.T.  Neither argument has merit.

## A

Once the juvenile court terminates reunification services, it sets a permanency planning hearing.  (*In re D.M.* (2021) 71 Cal.App.5th 261, 268.)  At this hearing, the focus is on the best interests of the child, and the default option is adoption.  (*Caden C.*, *supra*, 11 Cal.5th at pp. 631, 639–640.)  The statute reflects the Legislature's clear and strong preference for the stability and security adoption provides.  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573–574.)  Only in exceptional circumstances, laid out in the statute, is it appropriate for the juvenile court to select a different plan.  (*Caden C.*, *supra*, 11 Cal.5th at p. 631.)

8

The exceptional circumstance the mother claims applies here is the parental bond exception.  (§ 366.26, subd. (c)(1)(B)(i).)  The Legislature recognized that in certain situations, despite the child being outside the parent's custody, the parental bond might remain so strong that the harm to the child from severing it outweighs the benefits of adoption.  (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)  To avail themselves of this exception, parents must establish that they visited the child consistently; that they have established a bond that benefits the child; and that termination of the bond would harm the child.  (*Id.* at p. 631.)

We review the juvenile court's findings about the first two factors for substantial evidence.  (*Caden C.*, *supra*, 11 Cal.5th at 639–640.)  The third factor requires the juvenile court to determine whether any harm the child would suffer from the severance of the parental bond would outweigh the benefit to the child of adoption.  (*Ibid.*)  The juvenile court must undertake a careful inquiry to untangle the burdens and benefits of the proposed action.  (*Id.* at pp. 633–634.)  We review this determination for an abuse of discretion.  (*Id.* at p. 640.)

In sum, our review is deferential rather than independent.

B

The mother first argues the juvenile court erred by considering her failure to reunify in finding the parental bond exception did not apply.  The mother is correct that juvenile courts may not consider a parent's failure to reunify or failure to make progress on case issues a categorical bar to this exception.  (*Caden C.*, *supra*, 11 Cal.5th at p. 637.)  Juvenile courts may consider such issues only to the extent they bear on the evaluation of whether the parent has established a beneficial

9

bond or whether severing the bond will cause detriment to the child. (*Id*. at pp. 637–639.)

Contrary to the mother's assertion, this juvenile court did not base its conclusion on the mother's failure to reunify. The court discussed and assessed the bond each parent had with D.T., concluding that "neither parent has proven the type of parental bond that outweighs the benefits of adoption here and that is of such a compelling nature that I should order a legal guardianship." The court noted that while D.T.'s bond with the mother was "strong to a degree," it was "not of the quality that justifies disrupting a plan of adoption." The court also found D.T. had a strong bond with the foster mother and was thriving in a safe home. The court noted that the mother had been given the opportunity to reunify and failed to do so. But context makes clear the court based its decision on the strength of the mother's bond with D.T. and the potential harm of severing it compared to the benefit to D.T. of the plan of adoption. (See *In re Katherine J.* (2022) 75 Cal.App.5th 303, 319–322 [affirming juvenile court's termination of parental rights where context made clear it had not relied on improper factors].) This was appropriate.

## C

The mother next argues that the juvenile court improperly "minimized" her bond with D.T. The mother seems to challenge both the court's finding that a beneficial bond did not exist and that termination would not harm D.T. The mother claims the juvenile court did not cite or follow *Caden C.* The court did not cite this decision, but that is of no moment. The court followed the decision's teachings, which is the key thing.

We review the first contention for substantial evidence, indulging all inferences and resolving all conflicts in favor of the

10

order.  Here, although there was evidence of a positive bond between the mother and D.T., there was also evidence that the relationship had negative effects on D.T.  The record belies the mother's assertion that their bond "was unequivocally positive."  Even during monitored visits, the mother continued to hit D.T.  D.T. feared her mother would hit her again.  She asked the judge to teach her mother not to hit her.  D.T.'s individual therapist stated that D.T. had mixed feelings about her mother and said she was "bad."  The foster mother noted that D.T. would at times regress after visits with her mother.  D.T. had been out of her mother's care for almost half her life.  Substantial evidence supports the juvenile court's finding the bond was not generally beneficial to D.T.

We review the second contention for abuse of discretion.  In determining whether severing the parental bond would harm the child, the juvenile court undertakes a delicate task.  (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)  The court must weigh the benefits and disadvantages of the child's potential life in an adoptive placement against the benefits and disadvantages of continuing the parental bond and a less secure placement.  (*Ibid*.)  This evaluation necessarily involves a degree of uncertainty.  (*Id*. at p. 640.)  We do not substitute our judgment for that of the juvenile court.  (*Id*. at p. 641.)

D.T. bonded very well with the foster mother and thrived in her care.  The foster mother provided a stable, safe home for D.T. and provided for all of her emotional, educational, medical, and dental needs.  D.T.'s behavior improved and she began to speak about her past trauma.  She was close with the foster mother's extended family.  Ample evidence showed the foster mother would give D.T. stability and love.

D.T.'s relationship with her mother was not entirely beneficial, as noted. The court fairly could conclude D.T.'s bond with her mother was detrimental, on grounds we already have reviewed.

The mother points out D.T.'s therapist thought maintaining the status quo would be best for D.T., which the mother asserts the juvenile court could best accomplish through a legal guardianship. But the mother omits the therapist's belief that the foster mother's adoption of D.T. was "a really good plan."

The mother asserts Canul improperly considered her ability to provide a permanent home for D.T. But Canul's report was an insubstantial factor in the juvenile court's decision: the report was only "marginally helpful."

The juvenile court's decision certainly was not arbitrary, capricious, or absurd. (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) Rather, the juvenile court's decision was well within its discretion.

## DISPOSITION

We affirm.

WILEY, J.

We concur:

STRATTON, P. J.          HARUTUNIAN, J.[*]

---

[*] Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.